**Mary Ann KEEFFE, et al., Plaintiffs,**

v.

**LIBRARY OF CONGRESS, et al., Defendants.**

**Civ. A. No. 82–291.**

United States District Court, District of Columbia.

May 16, 1984.

Stephen Daniel Keeffe, Stephen C. Skubel, Mark R. Fitzgerald, Washington, D.C., for plaintiffs.

Paul Blankenstein, Denise Cafaro, Hermes Fernandez, U.S. Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge:

The central issue in this litigation concerns the scope of the First Amendment rights of an employee serving in the legislative branch of the federal government. The specific question posed is whether the Library of Congress, on the authority of its current regulations, may discipline one of its professional analysts employed in the Congressional Research Service of the Library, for engaging in political activity on her own time.

### INTRODUCTION

Library of Congress Regulation ("LCR") 2023–7 provides that employees of the Library retain the right to "[s]erve as ... delegate[s] to ... political ... convention[s]" on their own time. That right, however, is tempered by another portion of LCR 2023–7 which provides that the Library may prohibit or limit the participation of its employees in a political activity "if participation in the activity would ...

create a conflict or apparent conflict of interests."

Plaintiff Mary Ann Keeffe, a Library employee, attended the 1980 Democratic Convention as an official delegate while on approved annual leave. She attended despite an opinion from the Library's Office of General Counsel that her attendance would create an apparent conflict of interests. As a result of Ms. Keeffe's attendance, the Library disciplined her by transferring her to another position within the Library for a period of one year; during that period she was ineligible for promotion. After exhausting certain remedies provided by the collective bargaining agreement between the Library and its employees, Ms. Keeffe, joined by the Congressional Research Employees Association ("Union") brought suit in this Court against the Library of Congress and certain Library officials claiming that defendants' actions violated plaintiffs' rights under the First Amendment. Both plaintiffs request declaratory and injunctive relief; Ms. Keeffe, in addition, seeks compensatory and punitive damages from her immediate superior at the Library.

At this time, the Court is presented with the defendants' motion to dismiss and the parties' cross motions for summary judgment. The motions present three issues: first, whether this matter is essentially a constitutional dispute with jurisdiction in this Court, or whether it is essentially a federal sector labor-management dispute with jurisdiction in the administrative and arbitral scheme set out in the applicable collective bargaining agreement pursuant to Title VII of the Civil Service Reform Act of 1978 ("CSRA"), 5 U.S.C. §§ 7101 *et seq.*, with judicial review only in a court of appeals; second, assuming that jurisdiction lies in this Court, whether defendants' conduct violated the First Amendment or any other constitutional provision; third, assuming that defendants' conduct did violate the Constitution, whether Ms. Keeffe, as part of her remedy, may maintain a cause of action for damages under *Bivens v. Six Unknown Named Agents of Federal Bu-*

*reau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

For the reasons discussed below, the Court determines that it has jurisdiction to entertain plaintiffs' claims; that defendants have violated plaintiffs' constitutional rights; and that consequently, plaintiffs are entitled to declaratory and injunctive relief. However, the Court rules that on the undisputed facts of this case Ms. Keeffe is not entitled to damages.

Because the contours of the collective bargaining agreement governing the action taken by the Library against Ms. Keeffe are controlled by the CSRA, this Memorandum Opinion begins with a discussion of the CSRA's framework before proceeding to the factual background. This will then be followed first, by a discussion of the legal question of jurisdiction, then the merits, and lastly, a discussion of the scope of the appropriate remedy.

### Statutory Framework

The CSRA establishes a comprehensive scheme for review of hiring, promotion and dismissal decisions affecting government personnel in the federal sector. Typically, three somewhat overlapping channels of review are available to a federal employee dissatisfied with an employer's personnel decision. *See generally Carter v. Kurzejeski,* 706 F.2d 835 (8th Cir.1983). First, an employee may take advantage of the grievance resolution procedure that by the CSRA's mandate must be included in any collective bargaining agreement. 5 U.S.C. § 7121(a). Any grievance within the coverage of the negotiated grievance procedure that is not satisfactorily settled through that procedure, is subject to binding arbitration. § 7121(b)(3)(C). Normally the employee may then file with the Federal Labor Relations Authority ("FLRA") exceptions to the arbitration award, § 7122, and afterwards, under limited circumstances, may seek judicial review of a final order of the FLRA in the appropriate court of appeals. § 7123. Under certain circumstances, rather than proceeding first before the FLRA the aggrieved employee may peti-

tion for review of the arbitration decision directly in the appropriate court of appeals. *See* § 7121(f); *Local 2578, American Federation of Government Employees v. GSA,* 711 F.2d 261, 263 (D.C.Cir.1983).

While this negotiated grievance procedure often covers all potential grievances, of importance here is that the CSRA permits a union and a federal agency to exclude certain matters from the negotiated grievance procedure and to establish some alternate mechanism for resolution of those matters. § 7121(a)(2). *See* H.R.Rep. No. 1717, 95th Cong., 2d Sess. 157 (1978), U.S. Code Cong. & Admin.News 1978, p. 2723.

Second, when appropriate, an employee may file with the FLRA a charge alleging an unfair labor practice on the part of the employer. § 7118. *See* § 7116. In processing the unfair-labor-practice charge, the FLRA fulfills the same function as that of the National Labor Relations Board in the private sector. *See Columbia Power Trades v. U.S. Department of Energy,* 671 F.2d 325 (9th Cir.1982). An unfair labor practice encompasses a refusal to bargain in good faith, § 7116(a)(5); *see* § 7117, and also the enforcement by the federal employer of a regulation in conflict with the collective bargaining agreement. § 7116(a)(7). The FLRA, in remedying an unfair labor practice, may issue a cease and desist order, § 7118(a)(7)(A), and may order reinstatement of an employee with back pay. § 7118(a)(7)(C). The FLRA's final order is subject to review in the court of appeals under section 7123.

Third, an employee may utilize the statutory appeals procedure in which he appeals an adverse action, *see* § 7512, initiated by the employer to the Merit Systems Protection Board ("MSPB"), §§ 7513(d), 7701, and from there to the court of appeals. § 7703. The parties here agree that Library employees such as Ms. Keeffe—as legislative, not executive employees—are excluded from the competitive service, *cf.* § 2101, and therefore lack the benefit of this statutory route to the Merit Systems Protection Board. Thus, for purposes of this suit, there exist only two nonjudicial avenues:

the negotiated grievance procedure (including any alternate mechanism under section 7121(a)(2)) set out in the collective bargaining agreement, and the unfair-labor-practice process before the FLRA.

In section 7116(d) the CSRA makes clear that in instances where an issue falls both within the collective bargaining agreement's negotiated grievance procedure and also within the FLRA's jurisdiction over unfair labor practices, the aggrieved party has the option of electing one or the other of the procedures, but not both.

As the recitation of facts below will reveal, for adverse actions initiated by the Library against an employee the collective bargaining agreement between the Library and the Union establishes an alternate mechanism—not part of the negotiated grievance procedure—for the employee to challenge that adverse action. Ms. Keeffe litigated her claim through that contractual adverse action scheme; the Union made an aborted attempt to litigate its claim as an unfair labor practice before the FLRA.

*Factual Background*

Ms. Keeffe is employed as an analyst in the Economics Division of the Congressional Research Service ("CRS"). The CRS is a department of the Library created to assist Congress in the analysis of legislative proposals and recommendations submitted by the executive branch. The CRS is obligated to perform its duties "without partisan bias." 2 U.S.C. § 166(d). The Congressional Research Employees Association is a labor union serving as the exclusive bargaining agent for all eligible employees of the CRS. The Union joins Ms. Keeffe in her request for declaratory and injunctive relief.

Defendant Daniel J. Boorstin is the Librarian of Congress and is sued in his official capacity only. Defendant Gilbert Gude is the Director of the Congressional Research Service, and though the complaint is less than clear on this point, is apparently being sued in both his official

and personal capacities.[1] The Library itself, an agency of the legislative branch of the federal government, *see* 2 U.S.C. §§ 131 *et seq.,* is also a named defendant.

## A

In September 1979, the Library and the Union negotiated a collective bargaining agreement, subject of course to the terms of the CSRA. With respect to regulations of the Library, such as the one regarding political activities of employees at issue here, the agreement imposes the obligation on the Library to bargain with the Union before modifying those regulations. Article IV, Section 3, B.[2] That obligation not to modify regulations prior to bargaining applies even to modification of existing practices and understandings that are not specifically articulated by the regulations. Thus, the agreement provides that "the parties agree to continue any existing and acknowledged ... practices and understandings not specifically inconsistent with this Agreement unless a change is mutually agreeable to the Parties." Article IV, Section 4.

For resolution of disputes that arise between the Library and its employees, the collective bargaining agreement establishes a negotiated grievance procedure in conformity with the directives of the CSRA. Aside from two relevant exceptions, the negotiated grievance procedure is the exclusive procedure for resolution of grievances. The agreement defines a grievance as

a complaint involving the violation of this Agreement, or the violation, or wrongful or improper interpretation of an LCR [Library of Congress Regulation] concerning personnel policies, practices, and conditions of employment. Such a grievance can be filed by the Association or by an affected employee.

Article XXXI, Section 1, A. Thus, with respect to the regulations, if the Library

violates or modifies any one of them or even one of the unwritten practices and understandings, then either the affected employee or the Union may raise the issue as a grievance under the negotiated grievance procedure.

The first relevant exception to the negotiated grievance procedure is the exception created by the CSRA in section 7116(d), and incorporated in Article XXXI, Section 2, C, of the collective bargaining agreement. If the matter can be raised either as a negotiated grievance procedure or as an unfair labor practice, then the negotiated grievance procedure is not exclusive. The aggrieved party, at his election, can pursue either remedy, but not both.

The second exception to this negotiated grievance procedure was created by the parties in their collective bargaining agreement. As they are entitled to do under the CSRA, *see* § 7121(a)(2), the Library and the Union decided to exclude from the negotiated grievance procedure those disputes stemming from adverse actions—such as demotions or transfers—instituted by the Library against an employee, and to create a separate contractual procedure for the processing of such actions. Article XXXII. For adverse actions, the agreement provides first for a recommended decision by an impartial management official appointed by the Director of the CRS, and then an appeal to a hearing officer to be selected by both parties.

The hearing officer's decision under the agreement's adverse action process is final and binding, Article XXXII, Section 9, D; the agreement makes no provisions for review of the hearing officer's decision. This absence of agency and judicial review stands in marked contrast to the availability of such review under the other components of the scheme established by the agreement and the CSRA. For Library employees this contractual adverse action process serves as the substitute for the

---

1. Defendant Gude was first served with process only in his official capacity, but later was also served personally.

2. All such references are to the September 1979 collective bargaining agreement between the Library of Congress and the Union.

CSRA's statutory adverse action process with its provisions for review through the statutory appeals procedure by the MSPB and the courts.

### B.

For federal employees in the executive branch, section 9 of the Hatch Act, 5 U.S.C. § 7324, sets forth the constraints on involvement in political activities. However, this is not true of employees of the Library of Congress. Such employees, by virtue of their status as legislative, not executive, employees, are not subject to the Hatch Act. Rather, the limitations on their involvement in political activities are contained in the Library's regulations.

LCR 2023–7, in effect long before the negotiation of the collective bargaining agreement, provides in relevant part:

Section 3. *Unrestricted Political Activities of Library Employees*

A. All employees are free to engage in political activity to the widest extent consistent with the restrictions imposed by law and by this Regulation. Each employee retains the right to

\* \* \* \* \* \*

(5) Be a member of a political party or other political organization and participate in its activities to the extent consistent with law and to the extent that such membership does not interfere with official duties or give the appearance of a conflict of interest;

(6) Attend a political convention, rally, fund-raising function, or other political gathering;

\* \* \* \* \* \*

(11) Serve as a delegate to a political or constitutional convention, so long as such service does not interfere with the time and attention required as a Library employee;

\* \* \* \* \* \*

B. Paragraph A. of this section does not imply or authorize an employee to engage in political activity in violation of law, while on duty, or while in a uniform that identifies him as an employee. The Library may prohibit or limit the participation of an employee or class of employees in an activity recognized by paragraph A. of this section, if participation in the activity would interfere with the efficient performance of official duties, or create a conflict or apparent conflict of interests.

LCR 2023–8 provides a means by which an employee or his supervisor may obtain an opinion in advance from the Library's General Counsel's Office as to whether a particular activity would create a conflict of interest under LCR 2023–7, Section 3 Paragraph B ("Paragraph B").

In June 1980, Library officials learned that Ms. Keeffe was a prospective delegate to the Democratic National Convention and advised her that serving as a delegate would create a potential conflict of interest. The Union protested, claiming that because the Library's announced position was contrary to its own regulations and to existing practices, the Library was required by the collective bargaining agreement to meet with the Union's officials and negotiate on the matter before enforcing its position. On August 7, 1980, in accordance with LCR 2023–8, defendant Gude solicited the opinion of the General Counsel for the Library on the propriety of Ms. Keeffe's attending the convention. Just before leaving for the convention Ms. Keeffe was notified of the opinion of the General Counsel that her attendance could give rise to a conflict of interests and would generate an apparent conflict of interests under Paragraph B. In forming that opinion the General Counsel focused on her position as a Congressional Research Service analyst and on the importance of congressional confidence in the impartiality of one serving in that position. He concluded that such an analyst serving as a delegate to the convention of a major political party could raise doubts in Congress as to whether the person was providing unbiased advice.

Despite the opinion of the General Counsel, Ms. Keeffe attended the convention. Thereafter, the Library instituted an ad-

verse action proceeding. Ms. Keeffe, represented by the Union, challenged the adverse action, and the matter was processed in accordance with the provisions of the collective bargaining agreement relating to adverse actions. Ultimately, a hearing officer upheld the adverse action which, in essence, was a transfer for one year to a position which precluded promotion review for the year.

Subsequent to the hearing officer's decision, on November 10, 1981, defendant Gude issued a memorandum to the effect that the hearing officer's decision was applicable to Congressional Research Service employees generally, and they were therefore precluded from participating in partisan political activity, such as that engaged in by Ms. Keeffe.

On January 29, 1982, Ms. Keeffe and the Union filed suit in this Court, seeking a declaratory judgment declaring that defendants' interpretation and application of paragraph B of the Library regulations is unconstitutional, and an injunction prohibiting defendants from restricting CRS employees from exercising the rights listed in Section 3, Paragraph A of LCR 2023-7. In addition, Ms. Keeffe alone seeks compensatory and punitive damages from defendant Gude.[3]

On May 10, 1982, the Union filed a charge with the FLRA alleging that defendant Gude's November 10, 1981, memorandum constituted an unfair labor practice. Soon afterwards, however, while this action in this Court was proceeding, the Union withdrew its charge from the FLRA.

## LEGAL ANALYSIS

### A.

### *Jurisdiction*

■ In arguing that this Court lacks jurisdiction, defendants contend that the CSRA's statutory scheme, including its contractual, arbitral and administrative

components, is exclusive, thereby preempting the litigation before this federal district court. They then argue that while the CSRA's exclusive jurisdiction will have an effect on Ms. Keeffe different from its effect on the Union, it still precludes both plaintiffs from bringing their grievances before this Court.

With respect to Ms. Keeffe, the defendants point out that she has already litigated her claims in the adverse action proceeding before a hearing officer. They then argue that because the collective bargaining agreement makes no provision for appeal of the hearing officer's final and binding decision, that decision is not reviewable. *See, e.g., Republic Steel Corp. v. Maddox,* 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965). Accordingly, she is precluded from bringing her case here or pursuing it elsewhere.

With respect to the Union, defendants are somewhat more charitable. They concede that the Union in its own right has never had an opportunity to challenge the validity of the Gude Memorandum and the future application of Paragraph B to other CRS employees, and is therefore not barred from now pressing those claims. They recognize that the Union may contest the Gude Memorandum through the negotiated grievance procedure as a "complaint involving the violation of [the collective bargaining agreement] ... or the improper interpretation of an LCR." Or, it may charge the defendants before the FLRA with an unfair labor practice by alleging that their actions amounted to a refusal to bargain before modifying a prior practice and understanding, .*see* § 7116(a)(5), or the enforcement of a regulation in conflict with the collective bargaining agreement. *See* § 7116(a)(7). Indeed, the Union itself argued in its short-lived proceeding before the FLRA, that defendants committed such an unfair labor practice. But the defendants vigorously contend that this Court is a forum which is not available to the Union.

---

**3.** In the complaint, Ms. Keeffe seeks the damages jointly and severally from all defendants. However, plaintiffs' Cross Motion for Summary Judgment, limits the request for damages to defendant Gude.

In short, defendants claim that Ms. Keeffe may no longer pursue her claim at all while the Union must pursue its claim only within the CSRA's scheme.

The plaintiffs argue that even if the CSRA's scheme is exclusive, an exception exists for constitutional claims. They contend that such claims are more appropriately resolved by a federal court, even if previously adjudicated in one of the forums afforded by the CSRA. They analogize their constitutional claims to the claims in *Barrentine v. Arkansas-Best Freight System*, 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981) and *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). *See also McDonald v. City of West Branch*, — U.S. —, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984). In those cases, the Supreme Court permitted aggrieved employees to file certain federal claims in federal district court, despite the .fact that the employees had already lost in arbitration under their respective collective bargaining agreements.

In *Barrentine* the Supreme Court permitted the employee to sue on a minimum wage claim under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* In *Gardner-Denver* the Court permitted the employee to sue on a discrimination claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* In *McDonald*, the most analogous case, the Court permitted a local police officer who had lost at arbitration to sue in federal district court on a First Amendment claim under 42 U.S.C. § 1983. The Court stated that "although arbitration is well suited to resolving contractual disputes, our decisions in *Barrentine* and *Gardner-Denver* compel the conclusion that it cannot provide an adequate substitute for a judicial proceeding in protecting the federal statutory and constitutional rights that § 1983 is designed to safeguard." 52 U.S.L.W. at 4459.

The Court in *McDonald* proceeded to list four reasons—all applicable to plaintiffs' claims here—supporting the conclusion that an employee may sue in federal district court on certain federal statutory and constitutional claims, despite having already lost at arbitration. First, "an arbitrator's expertise 'pertains primarily to the law of the shop, not the law of the land.'" *Id.* (*quoting Gardner-Denver*, 415 U.S. at 57, 94 S.Ct. at 1024). Second, because an arbitrator's authority derives only from the collective bargaining agreement, he may have no authority to protect noncontractual rights, such as plaintiffs' First Amendment rights, which arise outside the contract. Third, the employee's union usually controls presentation of the employee's case to the arbitrator, even though the union's interests may not always be compatible with the employee's. Lastly, arbitral factfinding is not as extensive as, and is not accompanied by the safeguards accompanying judicial factfinding. *Id.*

However, though *McDonald*'s four factors militate strongly in favor of permitting plaintiffs to avoid the CSRA and bring this constitutional tort suit before this Court, those factors are by no means dispositive. *McDonald, Barrantine* and *Gardner-Denver* dealt only with employees who were *not* governed by the CSRA; they did not deal with employes such as Ms. Keeffe who are governed by the CSRA, and enjoy the CRSA's comprehensive array of substantive and procedural protections. In permitting an employee not covered by the CSRA to circumvent the relatively inadequate contractual arbitration process, the *McDonald* line of cases did not necessarily permit a federal employee who is covered by the CSRA to circumvent that statute's broad remedial scheme. *See Kurzejeski*, 706 F.2d at 842. Thus this Court, in deciding whether to entertain the claims of plaintiffs here, must analyze the question in the context of those cases dealing with federal employees who *are* covered by the CSRA.

Just recently, in *Andrade v. Lauer*, 729 F.2d 1475 (D.C.Cir.1984), the court ruled that the CSRA does not establish an exclusive jurisdictional scheme. Rather, the court there viewed the CSRA as simply setting forth a set of administrative remedies which need be exhausted before the

filing of suit. At 1484–1490. The court in *Andrade* specifically noted that "the exhaustion requirement is not ... jurisdictional in nature," *id.* at 1484, and should therefore be applied not blindly, but "in accordance with its purpose." *Id.*

In *Andrade*, employees of the Department of Justice, without first resorting to the CSRA's remedies, challenged a reduction in force (RIF), alleging that its implementation violated federal personnel regulations, statute, and the Appointments Clause, Art. II, § 2, cl. 2 of the Constitution. The Court of Appeals, after examining the rationale behind the exhaustion requirement, *id.* at 1484–1485, dismissed the personnel and statutory claims for failure to exhaust the CSRA's remedies, holding that the employees were "obligated to proceed in the first instance in accord" with the CSRA's scheme. *Id.* at 1486. But the court did not dismiss the constitutional claim, in which the employees contended that in contravention of the Appointments Clause the officials implementing the RIF were not appointed by the President and confirmed by the Senate. The court reasoned that exhaustion makes little sense in constitutional claims such as the claim under the Appointments Clause, where the decisionmakers in the CSRA's scheme "have neither the qualifications nor the expertise to articulate and develop these principles." *Id.* at 1491.

Applying *Andrade*'s exhaustion analysis to the claims of Ms. Keeffe and the Union, the Court concludes that they may press their First Amendment claims in this forum. Ms. Keeffe may certainly press her claim, since she has already exhausted her administrative remedies by litigating the Library's adverse action to the point of no further appeal. But even the Union, which has not exhausted its administrative remedies, may pursue its First Amendment claim directly in this Court, since the claim is a constitutional one susceptible of immediate disposition on summary judgment, and requires an analysis wholly outside the expertise of the CSRA's decisionmakers. Furthermore, even though the Union might also be able to challenge the Library's in-terpretation and application through non-constitutional avenues—by alleging an unfair labor practice or a grievance—the Union need not pursue its nonconstitutional claims first. Like the constitutional claim in *Andrade*, the Union's First Amendment claim need not await exhaustion of nonconstitutional claims. *See id.* at 1491–1493.

In short, under *Andrade* both Ms. Keeffe and the Union are free to bring their constitutional claims here.

This conclusion is supported by a line of cases in this Circuit predating *Andrade*. Though speaking in terms of CSRA exclusivity rather than exhaustion, *see, e.g., Carducci v. Regan*, 714 F.2d 171, 175 (D.C.Cir. 1983) ("the exclusivity of CSRA remedies"), those cases held that a district court must entertain the constitutional claim of a federal employee, especially in the unusual situation where the employee is limited in his choice of remedies under the CSRA and cannot appeal to the MSPB. *Carducci*, 714 F.2d at 175–176 (reassigned federal employee, unable to appeal to the MSPB, could bring Fifth Amendment action in federal district court); *Cutts v. Fowler*, 692 F.2d 138, 140 (D.C.Cir.1982) (transferred federal employee, unable to appeal to MSPB, could bring Fifth Amendment action in federal district court); *Borrell v. United States International Communications Agency*, 682 F.2d 981, 990 (D.C.Cir. 1982) (probationary federal employee, unable to appeal to the MSPB, could bring a First Amendment action in federal district court). *See Bartel v. Federal Aviation Administration*, 725 F.2d 1403 at 1415 (D.C.Cir.1984) (district court must entertain constitutional claim of federal employee where the statutory scheme protecting federal employees provides no remedy).

Plaintiffs here, because of the Library's status as a legislative rather than executive agency, do not have available to them the CSRA's statutory appeals procedure culminating in the MSPB, and therefore, like plaintiffs in *Carducci, Cutts* and *Bor-*

*rell,* may press their constitutional claims in this Court.[4]

Lastly, the Court notes that its decision to permit Ms. Keeffe and the Union to litigate their constitutional claims may be at variance with the Eighth Circuit's opinion of *Kurzejeski.* The court there did not adopt the exhaustion analysis of *Andrade,* but instead adopted the arguments of defendants here that the CSRA is "the exclusive means of redress" even for constitutional claims. *Kurzejeski,* 706 F.2d at 840. In *Kurzejeski,* the employees alleged that they were discharged from a Veterans Administration Hospital because of their union activity, in violation of their rights under the First Amendment. Even though the court there recognized that the employees clearly alleged conduct which violated the First Amendment's protection of union membership and participation, the court still held that the employees had to process their constitutional claims through one of the various mechanisms established by the CSRA, and not in district court. *Kurzejeski,* 706 F.2d at 838–39. *See Columbia Power Trades,* 671 F.2d at 327 ("it is manifestly the expressed desire of Congress to create an exclusive statutory scheme"); *Buckley v. American Federation of Television and Radio Artists,* 496 F.2d 305 (2d Cir.) (suit alleging that agreement between private employer and union violated First Amendment, held to fall within the exclusive jurisdiction of the National Labor Relations Board as an unfair labor practice), *cert. denied,* 419 U.S. 1093, 95 S.Ct. 1342, 43 L.Ed.2d 433 (1974); *Schussel v. Weinberger,* 562 F.Supp. 819 (D.Mass.1983).

Nonetheless, even under *Kurzejeski* 's strict jurisdictional analysis, this Court may have jurisdiction over plaintiffs' constitutional claims. First, *Kurzejeski* held that First Amendment claims arising from the employee's conduct *at* the workplace had to be processed under the CSRA, but specifically left open the question of independent federal jurisdiction over First Amendment claims arising from conduct

*away* from the workplace. 706 F.2d at 843 n. 9. Here, Ms. Keeffe and the Union's claim arises from conduct taking place on the employee's own time away from the workplace at political conventions. *See Kelly v. United States Postal Service,* 492 F.Supp. 121, 126–27 (S.D.Ohio 1980). Second, *Kurzejeski* stressed that the CSRA preempts federal district court jurisdiction even over constitutional claims because of the CSRA's comprehensive remedial scheme. But plaintiffs here do not enjoy the CSRA's full array of remedies; they cannot appeal to the MSPB. Consequently, in the present context the CSRA may not necessarily have its usual preclusive effect. Last, the Court in *Kurzejeski* pointed out that by processing the constitutional claims through the CSRA, the plaintiffs there could still obtain judicial review. *Id.* at 841. In contrast, Ms. Keeffe has no appeal from the hearing officer's determination. This absence of judicial review also argues in favor of recognizing independent jurisdiction in this Court. *See Dugan v. Ramsay,* 727 F.2d at 194–95.

In sum, the CSRA does not deprive this Court of its jurisdiction to decide plaintiffs' constitutional claims.

## B.

### Merits

Accepting the premise that there is an exception to the normally exclusive jurisdictional scheme established by the CSRA, the Court now considers the merits: The question presented is whether the Gude Memorandum and the adverse action against Ms. Keeffe violate plaintiffs' constitutional rights.

■ The foundation upon which analysis of the merits must build is that serving as a delegate, a political activity, is protected by the First Amendment, *see, e.g., Buckley v. Valeo,* 424 U.S. 1, 14–15, 24–25, 96 S.Ct. 612, 632–633, 637–638, 46 L.Ed.2d 659 (1976); *United Public Workers v. Mitchell,*

---

4. The First Circuit has gone even further, holding that where there is no appeal to the MSPB, an employee may press even nonconstitutional claims in federal district court. *Dugan v. Ramsay,* 727 F.2d 192 (1st Cir.1984).

330 U.S. 75, 94–95, 67 S.Ct. 556, 566–567, 91 L.Ed. 754 (1947), and perhaps by other constitutional provisions as well. *See Public Workers*, 330 U.S. at 94–95, 67 S.Ct. at 566. The components of the First Amendment triggered by such activity include the right to associate and the right to participate in political activities. *See Buckley v. Valeo*, 424 U.S. at 14–15, 24–25, 96 S.Ct. at 632–633, 637–638; *United States Civil Service Commission v. National Association of Letter Carriers*, 413 U.S. 548, 567, 93 S.Ct. 2880, 2891, 37 L.Ed.2d 796 (1973). As a consequence of this constitutional protection, the Supreme Court in *Buckley v. Valeo* invalidated statutory limitations on a candidate's expenditure of funds in a political campaign for federal elective office, holding that those limitations "place substantial and direct restrictions on the ability of candidates, citizens, and associations to engage in protected political expression, restrictions that the First Amendment cannot tolerate." 424 U.S. at 58–59, 96 S.Ct. at 653–654.

However, this First Amendment right is not absolute. *Buckley v. Valeo*, 424 U.S. at 25, 96 S.Ct. at 637; *Letter Carriers*, 413 U.S. at 567, 93 S.Ct. at 2891. Even a significant interference with this right may be sustained if the governmental interest is sufficiently important, and if the governmental interference is "closely drawn to avoid unnecessary abridgment of associational freedoms." *Buckley v. Valeo*, 424 U.S. at 25, 96 S.Ct. at 638. Thus, for example, the Supreme Court in *Buckley v. Valeo*, even while invalidating the limitations on expenditures by political candidates, upheld limitations on political contributions to those candidates, despite the protection afforded by the First Amendment.

In this instance, the government's interest is "in promoting the efficiency of the public services it performs through its employees." *Letter Carriers*, 413 U.S. at 564, 93 S.Ct. at 2890 (*quoting Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968)). The Supreme Court has repeatedly upheld restrictions on the political activities of governmental employees when such restrictions are properly designed to achieve the governmental interest in political neutrality in the operation of government. *See Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); *Letter Carriers; United Public Workers*. In *Letter Carriers* the Court upheld the constitutionality of section 9(a) of the Hatch Act, which prohibits federal employees of the executive branch from taking "an active part in political management or political campaigns." In so holding, the Supreme Court announced that "[a]n Act of Congress ... would ... unquestionably be valid ... if, in plain and understandable language, the statute forbade activities such as ... serving as a delegate ... to a political party convention." *Letter Carriers*, 413 U.S. at 556, 93 S.Ct. at 2886.

Thus, if the Library of Congress had sought to bar Ms. Keeffe from serving as a delegate to political conventions by means of "an Act of Congress" drawn in "plain and understandable language," that restriction on her political involvement would unquestionably be valid under the First Amendment. Here, however, defendants relied upon a set of regulations promulgated by the Library of Congress rather than a congressional enactment. Plaintiffs argue that there has been no *legislative* finding by *Congress* that restriction of the political activities of legislative employees—as distinct from executive employees encompassed by the Hatch Act—is a compelling public interest, and no congressional delegation of authority to the Library to limit those activities. Furthermore, according to plaintiffs, the regulation as interpreted by the Library—in contrast to the strictly construed enactments in *Letter Carriers, Public Workers* and *Broadrick* —is by no means "plain and understandable," but rather unconstitutionally vague and overbroad. For all these reasons, plaintiffs contend that the Library's actions are repugnant to the Constitution.

This Court need not resolve all of the problems raised by plaintiffs, for the Court holds that Paragraph B of LCR 2023–7,·

Section 3, as interpreted and applied, is unconstitutionally vague.

A vagueness challenge is in reality a due process challenge under the Fifth Amendment. *E.g., Village of Hoffman Estates v. Flipside, Hoffman Estates,* 455 U.S. 489, 497, 102 S.Ct. 1186, 1192, 71 L.Ed.2d 362 (1982). The Supreme Court has set forth the following formulation to govern the vagueness inquiry:

> Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory applications.

*Grayned v. City of Rockford,* 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972) (footnotes omitted) (*quoted* in *Flipside,* 455 U.S. at 498, 102 S.Ct. at 1193). This inquiry applies with equal force to regulations as it does to statutes. *See, e.g., Big Mama Rag v. United States,* 631 F.2d 1030 (D.C.Cir.1980) (invalidating IRS regulation as vague).

This vagueness scrutiny under the Due Process Clause is applied with varying force depending on the circumstances. It applies less strictly to enactments concerned with economic regulation, those involving only civil penalties, and those that contain a scienter requirement which mitigates the problem of adequacy of notice. It applies with greater strictness to criminal laws, and laws implicating constitutionally protected rights, such as the First Amendment, for the reason that

> where a vague statute "abut[s] upon sensitive areas of basic First Amendment

freedoms," it "operates to inhibit the exercise of [those] freedoms." Uncertain meanings inevitably lead citizens to " 'steer far wider of the lawful zone' ... than if the boundaries of the forbidden areas are clearly marked."

*Grayned,* 408 U.S. at 109, 92 S.Ct. at 2299 (footnotes omitted). Consequently, though the vagueness scrutiny is mandated by the Fifth Amendment, that scrutiny is magnified when First Amendment concerns are implicated.

A final factor affecting the strictness of the vagueness determination is the existence of any administrative avenue by which the employee can resolve any ambiguity as to the meaning of the regulation at issue and its applicability to the employee's conduct. *See Letter Carriers,* 413 U.S. at 580, 93 S.Ct. at 2897. The presence of such a procedure militates against a finding of vagueness.

In this proceeding there exists a confusing amalgam of factors, some demanding stricter application of the vagueness scrutiny, others permitting laxer application. Obviously, no criminal charges are involved. Also, there is an administrative process available to an employee desirous of clarifying the permissibility of any contemplated political activities. Both factors point to a loose application. These, however, are more than outweighed by other countervailing factors. Involved is not simply an economic regulation, but rather a regulation affecting an employee's expression under the First Amendment, and the employee's job—property—which also enjoys constitutional protection. *See, e.g., Board of Regents v. Roth,* 408 U.S. 564, 576–78, 92 S.Ct. 2701, 2708–09, 33 L.Ed.2d 548 (1972).

Application of the vagueness test with at least a measure of careful scrutiny to the Library's Paragraph B, as interpreted by the Library, mandates the conclusion that the regulation as interpreted is unconstitutionally vague.

The regulation at issue here does not set forth a *per se* rule either permitting or

barring Library employees from serving as delegates. Rather, it gives with the right hand—permitting employees to serve as delegates—but then takes with the left—in authorizing the Library to prohibit such activity when such activity "create[s] a conflict or apparent conflict of interest." Despite this somewhat ambivalent attitude, in a vacuum this "conflict of interest" regulation would in all likelihood not be impermissibly vague. It is copied almost *verbatim* from a similar clause which was part of the Hatch Act's scheme of regulation upheld by the Supreme Court in *Letter Carriers.* 413 U.S. at 576 n. 21, 93 S.Ct. at 2896 n. 21. *See also* 5 C.F.R. § 733 (regulations promulgated under the Hatch Act).[5] Here, however, the Court cannot view the regulation in a vacuum, but rather must examine it as interpreted by the Library. *See Kolender v. Lawson,* 461 U.S. 352, 103 S.Ct. 1855, 1857, 75 L.Ed.2d 903 (1983); *Flipside,* 455 U.S. at 494 n. 5, 102 S.Ct. at 1191 n. 5. It is with that interpretive gloss that the regulation crosses from the constitutional to the unconstitutional.

Contrary to the Library's interpretation, a *straightforward* reading of the regulation contemplates the following situation: As a general matter "employees are free to engage in political activity." Included in that is the right to "serve as a delegate to a political ... convention." However, under exceptional circumstances, indicating a need for a departure from the norm, the Library may prohibit such activities to avoid "a conflict or apparent conflict of interests." The rule is the right to serve; the exception is the prohibition.

With respect to CRS employees the Library's interpretation exchanges the exception for the rule, or, even worse, eliminates the right altogether. Under the Library's interpretation CRS employees are forbidden from ever serving as delegates, since the specialized nature of their employment always creates a conflict or apparent conflict of interests. If that be the case, then these regulations in no way "give the per-

son of ordinary intelligence a reasonable opportunity to know what is prohibited," *Grayned,* 408 U.S. at 108, 92 S.Ct. at 2298, since Paragraph B does not even hint at such a broad prohibition. Furthermore, the standard set forth in Paragraph B, if understood with the Library's interpretation, becomes in actuality a standardless means of delegating authority to Library authorities "for resolution on an *ad hoc* and subjective basis with the attendant dangers of arbitrary and discriminatory applications." *Id.* Employees will shy away from activities protected by the First Amendment, unsure of whether or not the regulations will be applied straightforwardly or in a manner contrary to their simple meaning.

The vagueness is further underscored by the ease with which the Library could have clarified its regulations. LCR 2023–7, by its terms, protects the right of *"all employees"* to engage in political activity. Yet in contradiction to that provision, the Library's interpretation does *not* protect all employees; it specifically excludes CRS employees. The Library could have easily incorporated that exception into its regulations and thereby rendered the regulations indubitably clear. Indeed, the Library did incorporate a limitation of another sort into the provisions pertaining to employees serving as delegates: that an employee may not serve as a delegate if such service "interfere[s] with the time and attention required as a Library employee." LCR 2023–7, Section 3, Paragraph A(11). The fact that the Library demonstrated its ability to list limitations when necessary, and its failure to list an easily articulated prohibition on CRS employees, would lead the reasonable CRS employee to believe that no such prohibition applies to him.

In sum, whether or not the Library by way of regulation may bar CRS employees from serving as delegates is a question this Court need not now address. The Court does hold that the current version of the

---

**5.** A key difference however, is that unlike LCR 2023–7, the regulations in *Letter Carriers* and 5

C.F.R. § 733 expressly prohibit employees from serving as delegates.

regulations, as interpreted by the Library, cannot survive a constitutional challenge.

The Library makes much of its mechanism under LCR 2023–8 which permits an employee to ascertain in advance whether the intended activity is proscribed or permitted. In this instance, the Library utilized that process and alerted Ms. Keeffe just prior to her departure for the convention that she was running afoul of the regulations. That warning, the Library argues, was sufficient to save the regulation from constitutional attack.

The Library is correct, up to a point, that this mechanism can help cure the regulations from the vagueness malady. *See Letter Carriers*, 413 U.S. at 580, 93 S.Ct. at 2897. But the process can be exploited only to clarify the regulation, not to amend it. LCR 2023–8 is efficacious only insofar as it "remove[s] any doubt there may be as to the meaning of the law," *Letter Carriers*, 413 U.S. at 580, 93 S.Ct. at 2898, but not insofar as it repeals the law. By precluding CRS employees from ever serving as delegates, the Library has gone beyond clarification and has effectively abrogated the regulation while supposedly leaving it in effect.

The Library's interpretation of Paragraph B, barring CRS employees from serving as delegates to political conventions, renders the regulation unconstitutionally vague, and the regulation, as interpreted and applied, is null and void without any force or effect.

## C.

### *Remedy*

Both plaintiffs seek injunctive relief; Ms. Keeffe alone, alleging an implied right of action for damages under *Bivens*, seeks damages from defendant Gude. Gude, in opposing the request for damages, argues that even if Ms. Keeffe is correct in her assertion that the defendants violated her constitutional rights, she nonetheless is precluded from seeking damages from Gude for two reasons: first, under *Bush v. Lucas*, 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983), courts may not imply a private damage action for a federal employee who has available to him adequate administrative remedies; and second, that Gude is immune under *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Without deciding the effect of *Bush*, the Court dismisses that portion of the complaint seeking damages, because of Gude's qualified immunity as a federal official under *Harlow v. Fitzgerald*.

In *Bivens* the Supreme Court recognized a cause of action for damages arising directly from the Constitution against federal agents for their constitutional torts. Defendants, in arguing that *Bush* forbids the maintenance of such a suit in this case, present the Court with a difficult legal question. *Bush* held that a federal employee who has available to him the administrative remedies leading up to the Civil Service Commission (now the MSPB) could not maintain a *Bivens* action because the administrative remedies constitute an adequate alternative to the *Bivens* suit.

Here, the problem is whether the administrative remedy available to Ms. Keeffe was an adequate alternative to a *Bivens* suit in light of the fact that she could not appeal to the MSPB. Ms. Keeffe's claim was adjudicated through the adverse action process and she also had available to her the process governing the filing of unfair labor practice charges. But she never had access to the statutory appeals process culminating in the MSPB which the Supreme Court in *Bush* found to be the effective alternate remedy precluding a *Bivens* action. *See Bartel*, 725 F.2d at 1415. Whether or not a *Bivens* action may be maintained in a situation where only some administrative remedies are available is a problem the Court need not resolve,[6] in

---

**6.** This question is reminiscent of, but not identical to the question of jurisdiction. Previously, this Court held that jurisdiction lies in this Court and that the CSRA's jurisdictional scheme is not exclusive in this case even under *Kurzejeski*, partly because only a portion of the CSRA's

view of its acceptance of Gude's second argument.

Gude's second argument is that under the qualified immunity standard of *Harlow v. Fitzgerald* he is entitled to summary judgment. There the Supreme Court held

> we conclude today that bare allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery. We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

457 U.S. at 817–18, 102 S.Ct. at 2738–39. In applying this standard with an eye towards precluding the pressing of insubstantial claims, a court

> [o]n summary judgment ... appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful.... [T]he defense would turn primarily on objective factors.

*Id.* at 818–19, 102 S.Ct. at 2739 (footnote omitted).

■ The Court finds as a matter of law that Gude cannot be held liable for damages since his conduct did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." Even though the Court essentially rules in plaintiffs' favor on the vagueness issue, that by no means

indicates that Gude should have known that the Library's interpretation of the regulation was unconstitutionally vague. Rather, the situation at the time was such that it was by no means clear that Ms. Keeffe's employers should have known of the infirmities attendant upon their decision. Under *Letter Carriers*, the Library may permissibly bar its employees from serving as delegates, if that prohibition is sufficiently clear and sufficiently supported by authority of Congress. The decision to prevent Ms. Keeffe from attending the convention was based on regulations similarly worded to those approved, at least in part, by the Supreme Court in *Letter Carriers*. Furthermore, Gude obtained an opinion from the Library's General Counsel supporting this position. The opinion, four pages in length, advised Gude that Ms. Keeffe's attending the convention would create a possible conflict of interest. The issue of whether that opinion renders the otherwise valid regulation void for reasons of vagueness is an issue with which this Court has grappled and resolved only after extended consideration. To expect Gude to make that sort of determination correctly would render governmental officials liable for damages because of their inability to prophesy precisely how a court will rule on an arcane question of constitutional law.

In sum, the portion of the complaint seeking damages from defendant Gude should be dismissed.

## CONCLUSION

The unusual posture of this case has presented the Court with a number of questions of first impression, many of them attributable to Ms. Keeffe's status as a legislative rather than executive employee. The Court concludes that the CSRA does not divest this Court of jurisdiction. As for

---

administrative remedies were available to plaintiffs. An entirely separate question is whether that partial administrative scheme also precludes a *Bivens* damage action. Conceivably, in view of the partial administrative scheme, the Court may assert its jurisdiction and award declaratory and injunctive relief, but then con-

clude that enough remains of the CSRA's administrative scheme to preclude additional relief by way of damages. Thus resolution of the jurisdictional issue does not automatically resolve the damage issue which the Court now leaves open.

the merits, the Court concludes that the Library's interpretation and application of its "conflict of interests" regulation, LCR 2023–7, Section 3, Paragraph B, is unconstitutionally vague. With respect to the remedy, the Court concludes that plaintiffs are entitled to declaratory and injunctive relief, but not damages.

## JUDGMENT AND ORDER

Based on the accompanying Memorandum Opinion, it is this 16th day of May, 1984, hereby

### ORDERED

That defendants' motion to dismiss for lack of subject matter jurisdiction is denied;

That defendants' motion for summary judgment is denied, except insofar as it asserts a qualified immunity from suit for damages;

That plaintiffs' motion for summary judgment, insofar as it seeks declaratory and injunctive relief on grounds of vagueness, is granted;

That the portion of the complaint seeking compensatory and punitive damages is dismissed;

That judgment is entered for plaintiffs on their request for declaratory and injunctive relief as provided herein; and it is

### DECLARED

That the defendants' adverse action against plaintiff Mary Ann Keeffe, predicated on their interpretation and application of Library of Congress Regulation 2023–7, Section 3, Paragraph B, is null and void, and without any force or effect;

That Library of Congress Regulation 2023–7, Section 3, Paragraph B, as interpreted and applied by defendants in the Gude Memorandum of November 10, 1981, is unconstitutionally vague; and it is

### ORDERED

That all records and references to the Library's adverse action against plaintiff Mary Ann Keeffe be removed from the Library's personnel records;

That Ms. Keeffe be afforded retroactively all and any benefits to which she would have been entitled as an employee of the Library of Congress, including promotion rights, had she not been subject to the adverse action imposed by the Library of Congress;

That after conferring with defendants' counsel, counsel for plaintiffs shall submit by May 28, 1984 a proposed Order detailing any further appropriate relief which would remedy the injury sustained by Ms. Keeffe as a result of the defendants' adverse action rendering her ineligible for promotion for a period of one year.