Gary M. VICTOR

v.

James H. BRICKLEY et al.

No. 8–70548.

United States District Court,
E. D. Michigan, S. D.

Sept. 5, 1979.

---

Joel S. Welber, Goldstein, Welber & Florey, Ann Arbor, Mich., for plaintiff.

Joseph A. Ritok, Jr., James D. Tracy, Detroit, Mich., David Y. Klein, Klein, Bloom & Gale, Southfield, Mich., for defendants.

## OPINION

FEIKENS, District Judge.

This civil rights action against several individual and institutional defendants arises from the summary suspension of the Plaintiff from his untenured teaching position at Eastern Michigan University. All Defendants move for summary judgment. Except for the subjective motivations of some of the principal Defendants, the parties agree on the facts of this case.

### Facts

Plaintiff holds an untenured faculty position at Eastern Michigan University (EMU) in the Administrative Services and Business Education Department. The Defendants are as follows: Gary Hawks is EMU's Vice President for Employee Relations; Donald Drummond was then acting Academic Affairs Vice President; James Green is EMU's Manager of Employee Relations; Earl Roth is the Dean of the Business College; Robert Ristau is the Head of the Administrative Services and Business Education Department; James Brickley was then President of EMU. Also named as Defendants are the EMU Board of Regents, the EMU Chapter of the American Association of University Professors (AAUP) and Judy Johnson, then EMU Chapter President.

In early January of 1978 one of Plaintiff's former students wrote a letter to Roth and Ristau alleging that Plaintiff had both attempted and accomplished sexual liaisons with some of his female students. Ristau thereupon commenced an investigation into the charges. Plaintiff learned of the investigation on January 16 and demanded that Ristau provide him with any documentary evidence the investigation had produced. When this request was refused, he filed a grievance under the provisions of the collective bargaining agreement then in effect between EMU and the AAUP.

On January 31, President Brickley notified Plaintiff by letter that he was suspended without pay, effective immediately. Brickley set forth the reasons for his action, advised Plaintiff to forward any information he might have in his defense, and recommended that he avail himself of the remedies provided by the collective bargaining agreement then in effect. Brickley's actions were taken pursuant to Article XII B.4. of that agreement:

A faculty member may be suspended for reasonable and just cause. Suspension of a faculty member shall be done only by the President. The issue of with or without pay shall be determined by the circumstances of the suspension.

Upon receipt of this letter, Plaintiff filed another grievance, under Subsection B.5. of Article XII which provides that subsection B.4. suspensions may be taken immediately to Step 3 of the contract's grievance procedure. Under the terms thereof, a six-member Review Board consisting of three faculty and three administration representatives are required to meet within ten (10) days of the request to attempt an adjustment of the grievance. If the grievance is not adjusted at Step 3, the dispute may be submitted to binding arbitration.

In this case, the ten (10)-day time limit on the Review Board meeting was extended for seven (7) days by agreement of Hawks and Johnson. On February 17 the meeting was held. Plaintiff was represented by two lawyers, his own and the AAUP's. Although Plaintiff was permitted to see two

letters detailing the allegations against him, at least some of the evidence being gathered by EMU administrators was not disclosed. The meeting resulted in a union-administration deadlock on whether to continue the Plaintiff's suspension, the effect of which was to advance the grievance to Step 4 arbitration.

On March 6 Drummond informed Plaintiff that EMU intended to transform his suspension into a termination, and that he had a right to a hearing before a committee of three tenured faculty members to be chosen by the procedure in Section B. of Article XII. On March 10 this lawsuit was filed. In early April the Hearing Committee convened, and after deliberation recommended Plaintiff be reinstated with full back pay. On April 25 this was done.

The hearing was similar to a trial. Plaintiff had the opportunity to publicly confront and cross-examine witnesses before an unbiased tribunal whose proceedings were recorded. He was allowed to call witnesses of his own, make a statement on his own behalf, and to be represented by counsel.

### The Complaint

As originally drafted, the Complaint contained four counts. The first was directed mainly toward securing an adversary hearing at which Plaintiff would be allowed to refute the allegations against him and secure reinstatement and back pay. It also requested a declaration that the contract's suspension and grievance procedures are constitutionally infirm on vagueness and overbreadth grounds. It also seeks an order directing the Defendants to delete all references to the suspension from his personnel file and cease any actions that might be construed as an invasion of his privacy.

Count II is essentially a challenge to the procedure by which the Hearing Committee is selected and the hearing conducted on due process and equal protection grounds. It seeks a declaration that portions of Article XII of the contract are unconstitutional and an injunction against the proceedings specified therein. Count III is merely an enumeration of the elements of damages Plaintiff claims. Count IV is a libel claim under the common law of Michigan based on a memorandum written and allegedly circulated by Defendants Ristau and Roth.

The theoretical underpinning of Counts I, II and III is the claim that the Defendants jointly and severally deprived Plaintiff of a property interest in his employment and a liberty interest in his reputation without adequate procedural safeguards. Plaintiff seeks damages in addition to the declaratory and injunctive relief already discussed. Jurisdiction over Counts I, II and III is founded on 28 U.S.C. § 1331, 28 U.S.C. § 1343; Count IV is here on principles of pendent-claim jurisdiction.

### Defendants' Motions

Before considering the motions, I must first identify what parts of the complaint are moot because of occurrences postdating it. I conclude that the following are moot: (1) ¶ 38.B—requests declaration that Plaintiffs (then) continued suspension deprived him of due process; (2) ¶ 38.E—requests reinstatement, back pay and a hearing; (3) ¶ 38.E.5.—requests injunction against the continuing investigation of Plaintiff; (4) all of Count II—that Count being essentially a challenge to the constitution and composition of the Review Board and to the President's power to overrule its determination.[1]

The claims that remain are as follows: (1) Plaintiff seeks damages for the deprivation of liberty and property which he has suffered; (2) damages for the Defendants' violation of his right to privacy; (3) a declaratory judgment that the actions of the Defendants violated his constitutional rights; (4) a declaration that Article XII B.4. violates the 14th Amendment; (5) a permanent injunction against future suspensions or terminations pursuant to XII

---

1. Note that certain portions of Count II pertaining to the validity of the collective contract's suspension and termination procedures survive because they are duplicative of averments contained in Count I. See ¶¶ 37 & 38.

B.4.; (6) expungement of references to the suspension from Plaintiff's personnel file.

### Defendants' Arguments

Defendants Johnson and the AAUP argue their actions are not "state action" and that they did not conspire or join with any of what might be called the "EMU Defendants" in any of the actions complained of. Alternatively, they claim that the requirements of procedural due process were complied with here. Finally, they allege there are no allegations of any bad motive or purpose on Johnson's part and that she and the AAUP should be protected by a qualified good-faith immunity.

The EMU Defendants argue: (1) Plaintiff received "all the process that was constitutionally due" in the instant circumstances; (2) Plaintiff lacks standing to challenge Article XII B.4. on either vagueness or overbreadth grounds; (3) the entire dispute is moot; (4) Plaintiff had no property interest in continued employment; (5) Plaintiff waived his rights to pre-suspension notice and hearing by the collective agreement; (6) Plaintiff has asserted no cognizable liberty interest; (7) the individual defendants enjoy qualified immunity.

### The AAUP and Johnson

The complaint fails to reveal exactly what these Defendants are alleged to have done to wrong the Plaintiff. Presumably, he complains of Johnson's agreement to adjourn the Review Board meeting for one week without his consent. As to the AAUP, Plaintiff says that it was "acting in concert with other proper defendants acting under color of state law to violate the Plaintiff's due process" rights. (Plaintiff's Supplemental Brief at p. 5) It could perhaps be concluded that the AAUP is alleged to have been at fault in either negotiating or acting in compliance with the contract provisions complained of. However, there is no allegation of any hostile motive in negotiating the contract, nor is it alleged that the AAUP cooperated with the EMU Defendants in the actions complained of. There is likewise no claim of a conspiracy between the AAUP, Johnson and the EMU Defendants. I conclude there are no facts to support the conclusion that the AAUP and Johnson acted "in concert" with the EMU Defendants in the occurrences complained of. Thus, the complaint must be dismissed as to the AAUP.

Yet another reason to dismiss the AAUP applies also to Johnson. For a defendant to be liable under § 1983 he must have taken some action "under color of law." *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978); *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 150, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Civil Rights Cases*, 109 U.S. 3, 11, 3 S.Ct. 18, 27 L.Ed. 835 (1883); *White v. Scrivener Corp.*, 594 F.2d 140, 141 (5th Cir. 1979); *Benner v. Oswald*, 592 F.2d 174, 179 (3rd Cir. 1979). There are many circumstances under which private individuals may act "under color of law" even though they are not state officers and do not perform any uniquely state function. In *Adickes*, the Supreme Court said that for § 1983 liability to attach "[i]t is enough that he [i. e., the alleged wrongdoer] is a wilful participant in joint activity with the State or its agents." 398 U.S. at 152, 90 S.Ct. at 1606. This is simply a logical extension of the more general requirement that to hold a person liable under § 1983 there must be an "exercise of power possessed only because the wrongdoer is clothed with the authority of the state. . . ." *Bellnier v. Lund*, 438 F.Supp. 47, 50 (N.D.N.Y.1977).

With these principles in mind, it is apparent that neither Johnson nor the AAUP acted "under color of law" insofar as this lawsuit is concerned. Neither was clothed with the authority of the state either by virtue of any special relationship thereto, or because of joint action with the state. Indeed, from all that the pleadings show, Johnson and the AAUP acted *in opposition to the state* by taking up Plaintiff's grievance. There is no allegation and no evidence that this representation was a sham or the result of secret collusion; there is no evidence that the state influenced or controlled their actions during the negotia-

tion of the instant collective agreement or in the processing of Plaintiff's complaint. It would stretch the concept of "state action" beyond its breaking point to hold that a public sector labor union's acts are those of the state merely because the union has entered into a collective agreement with a public entity and then conducted itself in conformity therewith.[2]

### The Declaratory Judgment Request

Under 28 U.S.C. § 2201, a court in "a case of actual controversy within its jurisdiction . . . [may] declare the rights and other legal relations of any interested party seeking such declaration. . . ." Plaintiff seeks to have me declare that his due process rights were violated and that Article XII B.4. is constitutionally defective. For the reasons which follow, the request is denied as to Article XII B.4. A declaration will issue in favor of Defendants as to the due process claim.

### The Contract Provision

 The decision of whether to grant a declaratory judgment rests in the discretion of the trial court, which should be exercised in a manner consistent with the public interest. *Mechling Barge Lines v. United States*, 368 U.S. 324, 331, 82 S.Ct. 337, 7 L.Ed.2d 317 (1961); *Southeastern Promotions, Ltd. v. Conrad*, 486 F.2d 894, 901 (6th Cir. 1973) *rev'd on other grounds*, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1974); *National Emblem Insurance Co. v. Washington*, 482 F.2d 1346 (6th Cir. 1973); 10 C. Wright & A. Miller, *Federal Practice and Procedure* § 2759 (1973); C. Wright, *Federal Courts* § 100 (3d ed. 1976). With regard to the challenged contract provision, many factors counsel against the issuance of a declaratory judgment. First, under the terms of Article XX, the instant collective agreement expired on August 31, 1978. And, though Article XX says the agreement is to continue on a year-to-year basis after August 31, 1978, the record does not show

whether Article XII B.4. is currently in effect or whether it will be in effect after Aug. 31, 1979. There is no point in adjudging the validity of an agreement that is not in force or may expire in the near future.

Second, in determining whether to issue a declaratory judgment, Professor Wright says that "[t]he determinative factor is whether the declaratory action will probably result in a just and more expeditious and economical determination of the entire controversy". *Federal Courts*, § 100 at p. 500 (footnote omitted). In this case, the judgment sought would do nothing to advance the litigation because there is no dispute currently pending as to the application of XII B.4. Instead, the only function the judgment would serve would be to add fuel to what has already become protracted and acrimonious litigation. In this respect, the case at bar stands in stark contrast to the kind of suit in which declaratory relief is appropriate. To illustrate, compare this case to one in which a party to a contract of insurance seeks a declaration as to the validity or coverage of the contract; prompt determination will often resolve the lawsuit. *E.g.*, 10 C. Wright & A. Miller, *Federal Practice and Procedure* § 2760, nn. 39–44 and accompanying text (1973). A declaration as to XII B.4. will be merely advisory.

Third, I have serious doubts as to whether the "dispute" over the validity of Article XII B.4. amounts to a "case and controversy" within the meaning of Article III, Section 2, of the United States Constitution. The governing principle in this connection is set forth by Wright & Miller as they quote from the Supreme Court's opinion in *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941):

The difference between an abstract question and a "controversy" contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fash-

2. Yet another ground upon which these Defendants could be dismissed is the lack of any showing that by their own volition they were personally involved in what Plaintiff claims is a constitutional deprivation effected by the EMU Defendants. *Hutton v. Heggie*, 454 F.Supp. 870, 875 (D.Colo.1978).

ion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. *Federal Practice and Procedure*, § 2757 at p. 755.

In this case, though there was perhaps some immediacy as to XII B.4. when the suit was filed, it has long since passed. From a practical standpoint, it is unlikely that the EMU administration will proceed against other faculty members or the Plaintiff in the future in the same manner as it proceeded against Plaintiff Victor here; the instant lawsuit has put EMU on notice that its conduct toward Victor was not above reproach, which it has acknowledged by reinstating Victor with full back pay. Thus, although the alleged controversy over XII B.4. might escape being moot on the ground that the problem is capable of recurring, *Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115, 121–123, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974), I do not believe that XII B.4. constitutes the sort of "continuing and brooding presence" which would justify declaratory relief in this instance.[3]

The second part of the declaratory judgment request pertains to the question of whether the EMU Defendants deprived Plaintiff of his due process rights by suspending him without first holding a hearing. Contrary to the request to evaluate XII B.4., this question is inextricably linked to the real issues in this case and so will be determined.

### Property and Liberty Interests

■ The threshold inquiry in a procedural due process case must be directed to whether the Plaintiff enjoyed any protectable property or liberty interests which were implicated by the Defendants' actions. Plaintiff Victor claims that under *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976) and similar cases, at the time immediately preceding his suspension he enjoyed a legitimate expectation of continued employment free from suspension except for cause and a liberty interest both in freedom from stigmatizing allegations against him and in having before him a range of employment opportunities which would be diminished by the loss of his employment attended by allegations of impropriety. I conclude that Plaintiff enjoyed a property interest in continued employment to the extent that he had a contractual right to his position for the duration of his contract, absent cause for suspension.[4] *Arnett v. Kennedy*, 416 U.S. 134, 166, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (Powell, J. concurring); *Jacobs v. Kunes*, 541 F.2d 222, 224–225 (9th Cir. 1976), *cert. denied* 429 U.S. 1094, 97 S.Ct. 1109, 51

---

**3.** There are also somewhat more pragmatic reasons for declining to declare on the validity of XII B.4. First, in any given case, whether there has been a constitutional deprivation will depend on the facts. And, though the contract may often affect the university's conduct, this is not necessarily so; a contractual breach and a constitutional deprivation may coexist or not overlap at all. Second, Plaintiff has failed to present any basis for concluding that the doctrine of overbreadth extends beyond the area of restrictions on First Amendment rights and that a contract is susceptible of vagueness analysis; the cases Plaintiff cites all deal with statutes and official regulations.

**4.** Defendants appear to have initially conceded this point. However, in their second supplemental brief they argue that as a probationary nontenured faculty member Plaintiff enjoyed no expectation of continued employment *per se*, nor did he enjoy any property interest in being suspended only for cause. As to the first point, although the record does not affirmatively disclose it, presumably Plaintiff was hired for either a semester or an academic year and thus enjoyed an expectation of continued employment for at least that period of time. As to the second point, the collective agreement to which Plaintiff and EMU were party provides that suspension shall only be for "cause." This creates a contractually based claim of entitlement under Michigan law. *Cain v. Allen Electric & Eqpt. Co.*, 346 Mich. 568, 78 N.W.2d 296 (1956); *cf. Keddie v. Pennsylvania State University*, 412 F.Supp. 1264 (M.D.Pa.1976).

L.Ed.2d 541 (1977); *Thurston v. Deakle,* 531 F.2d 1264, 1272 (5th Cir. 1976) *vacated for reconsideration in light of Monell v. Dept. of Social Services,* 438 U.S. 901, 98 S.Ct. 3118, 57 L.Ed.2d 1144 (1978); *David Gonzalez v. Calero,* 440 F.Supp. 989 (D.P.R.1977); *Bagby v. Beal,* 439 F.Supp. 1257 (M.D.Pa. 1977).

■ Plaintiff's liberty was also implicated by his suspension without pay because of alleged sexual improprieties with students. The prevailing view of the nature of constitutional liberty interests is stated by the court in *Bagby, supra*:

. . . the combination of an injury to a reputation and governmental action limiting a person's prior rights constitutes a deprivation of protected liberty. 439 F.Supp. at 1260.

This is the so-called "stigma-plus" test under which, if the state deprives one of a weighty interest, e. g., employment, in connection with the imposition of some stigma, then that person's liberty has been "taken." [5] *See: Nolan v. Ramsey,* 597 F.2d 577 (5th Cir. 1979); *Rodriquez de Quinonez v. Perez,* 596 F.2d 486, 489 (1st Cir. 1979); *McKnight v. Southeastern Pa. Transportation Authority,* 583 F.2d 1229, 1235–1237 (3rd Cir. 1978); *Sullivan v. Brown,* 544 F.2d 279 (6th Cir. 1976); *Gruenberg v. Kavanagh,* 413 F.Supp. 1132 (E.D.Mich.1976).

*Were the Instant Procedures Adequate?*

Having determined that Plaintiff was deprived of both liberty and property, the question becomes whether the procedures by which this deprivation was effected comported with the mandate of the 14th Amendment. This question boils down to whether some sort of notice and opportunity to be heard should have preceded the

suspension [6] or the plenary post-suspension procedures actually provided sufficed in this regard. Having thoroughly reviewed the applicable law as applied to the facts of the instant case, I conclude that, though the procedures followed in the instant case were less than exemplary, they satisfied the minimum required by the Constitution.

■ The parties agree that the applicable test for the adequacy of the instant procedures is set forth in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).[7] The answer lies in striking a balance among three factors: (1) the magnitude of the private interest affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and probable value of additional safeguards, if any; (3) the governmental interest furthered by the procedures used, considering the additional fiscal and administrative burdens that additional or substitute procedures would impose.

Review of cases decided using the analysis in *Mathews* yields little additional insight into this case. Indeed, their number and variation reinforces the conclusion that each case is unique and depends on its facts.

I conclude that though Plaintiff's interest in this case was certainly not negligible, it was not weighty enough to require more pre-deprivation procedures than were actually afforded. First, Plaintiff was not tenured; he was employed only for a limited time and had no expectation of indefinite or permanent employment. Second, Plaintiff was not terminated from his employment, but only suspended. He was temporarily removed from his employment subject to the condition that the university prove its

5. Note in this connection that the Defendants do not contest the fact that they were responsible for publishing the allegations concerning Plaintiff, thus satisfying one of the requirements of the liberty-interest deprivation § 1983 action. *Bishop v. Wood,* 420 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1975).

6. I do not accept Plaintiff's contention that he was actually terminated "subject to the condition subsequent that he would be reinstated

upon successful appeal." (Plaintiff's Brief at p. 14)

7. See also: *Ingraham v. Wright,* 430 U.S. 651, 675, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1976) (corporal punishment of schoolchildren); *Dixon v. Love,* 431 U.S. 105, 97 S.Ct. 1723, 52 L.Ed.2d 172 (1977) (driver's license); *Memphis Light, Gas & Water v. Craft,* 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978) (utility service).

charges. Third, though I do not intend to resurrect Justice Rehnquist's "bitter with the sweet" rationale from *Arnett v. Kennedy*, the contract under which Plaintiff was employed expressly provided for the treatment he received. Not only must this affect the scope of his property rights, but, as Defendants point out, there are principles of waiver applicable here. *E.g., Gorham v. Kansas City*, 590 P.2d 1051 (Kan.1979).

The risk of erroneous deprivation under the procedures followed was not large, even though it eventually turned out that it was improper from a contractual standpoint. The university engaged in what Plaintiff concedes was an extensive investigation before finally acting on January 31. Moreover, the allegations upon which it acted were rational and highly detailed; they bore many traditional indicia of truthfulness.

Finally, the governmental interest at stake here was strong. A state university has not only a desire but an obligation to avoid even the appearance of what might be characterized as sexual blackmail of students, at worst, and unprofessional conduct, at best. Moreover, the allegations against Plaintiff with which the university was confronted related not only to past conduct on his part, but to presently occurring improprieties.

 In view of the promptness with which Plaintiff obtained notice of the charges against him and ultimately a plenary trial-type hearing at which he cleared his name and secured reinstatement with back pay, I conclude he was not denied due process of law. I also note that even if there had been a technical denial of due process in this case, it would have been inappropriate to award punitive or exemplary damages, while compensatory damages would only have been nominal. In *Carey v. Piphus*, 435 U.S. 247, 258–259, 98 S.Ct. 1042, 1050, 55 L.Ed.2d 252 (1978), the Court said: "[T]he rules governing compensation for injuries caused by the deprivation of constitutional rights should be tailored to the interests protected by the particular right in question." A minor, technical violation of procedural due process in an employment context calls for only a nominal award of damages.

### Conclusion

Defendants Johnson and the AAUP are granted summary judgment because they did not act under color of law. Plaintiff's request for a declaration as to Article XII B.4. is denied as presenting an inappropriate case for the exercise of my discretion. As to the constitutional deprivation claim, summary judgment is granted for the EMU Defendants. The defamation and invasion of privacy claims are dismissed for lack of any substantial basis for federal jurisdiction.

An appropriate order may be submitted.