Eddie Lee TURNER and Mozella Donner, on behalf of themselves and all persons similarly situated, Plaintiffs,

v.

CHICAGO HOUSING AUTHORITY, a municipal corporation, and Vincent Lane, individually and in his official capacity as Chairman of the Board of Commissioners of the Chicago Housing Authority, Defendants.

No. 89 C 5801.

United States District Court, N.D. Illinois, E.D.

March 8, 1991.

Timothy Huizenga, Daniel J. Delaney, Susan Comory, Edwin F. Mandel Legal Aid Clinic, Catherine MacCarthy, Timothy Huizenga, Legal Asst. Foundation, Susan Rosenberg, Mandel Legal Aid Clinic, Chicago, Ill., for plaintiffs.

F. Willis Caruso, James J. Casey, Jill E. Evans, Fred J. Posont, Bradford T. Yaker, Keck, Mahin & Cate, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

HART, District Judge.

May a public housing authority evict a tenant because of criminal conduct committed by the tenant's adult child on project property? Crime in public housing projects poses a major threat to the welfare of tenants and the community. However, eviction of a project tenant is tantamount to declaring the tenant homeless. This case presents a clash of vital duties and rights.

Defendant Chicago Housing Authority ("CHA") is an Illinois municipal corporation. It receives funding under the United States Housing Act of 1937 (the "Housing Act") and provides and manages subsidized housing. Defendant Vincent Lane has been Chairman of the Board of Commissioners of CHA since July 1988. Plaintiffs sue on behalf of a class consisting of CHA leaseholders whose tenancies were terminated on or after April 23, 1988 based on the conduct of persons other than the leaseholder occurring outside the leaseholder's apartment.[1] The named plaintiffs are Eddie Lee Turner ("Turner") and Mozella Donner ("Donner"), both of whose CHA leases were terminated based on misconduct of a son occurring on CHA property, but not within the apartment unit of either named plaintiff. Plaintiffs allege that it violates various provisions of the Constitution; the Housing Act, 42 U.S.C. § 1437d(*l*); and plaintiffs' leases to terminate leases based on a non-household-member's conduct committed outside the leaseholder's apartment. Plaintiffs have moved for summary judgment on some of the class's claims for declaratory and injunctive relief. Plaintiffs also move for summary judgment on the question of liability on the named plaintiffs' individual claims, reserving the question of the amount of damages for further proceedings. Defendants have moved for summary judgment dismissing both the class and individual claims.[2]

On a motion for summary judgment, the entire record is considered with all reasonable inferences drawn in favor of the nonmovant and all factual disputes resolved in favor of the nonmovant. *Oxman v. WLS–TV*, 846 F.2d 448, 452 (7th Cir. 1988); *Jakubiec v. Cities Service Co.*, 844 F.2d 470, 471 (7th Cir.1988). The burden of establishing a lack of any genuine issue of material fact rests on the movant. *Id.* at 473. The nonmovant, however, must make a showing sufficient to establish an essential element for which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In such instances, the movant need not provide affidavits or deposition testimony showing the nonexistence of these essential elements. *Id.* at 324, 106 S.Ct. at 2553. Also, it is not sufficient to show evidence of purportedly disputed facts if those facts are not plausible in light of the entire record. *Collins v. Associated Pathologists, Ltd.*, 844 F.2d

---

1. Any leaseholder who was a party to a state forcible entry and detainer action pending at the time the class was certified in June 1990 is excluded from the class.

2. In a fit of excessive briefing, defendants filed 61 pages of briefs supporting their motion and opposing plaintiffs' motion. (This does not include another 8 pages of answers to plaintiffs' motions nor 34 pages of Local Rule 12(m) and 12(n) statements.) Such excessive briefing was absolutely unnecessary. There was certainly no need to file two separate briefs containing much duplication. (While it was also unnecessary for plaintiffs to file two separate opening briefs, they at least limited their briefs to 15 and 7 pages each and sought to avoid duplication.) Each brief of defendants, even standing separately, should have been shorter and more to the point. To the extent any argument of defendants has been missed, defendants have only themselves to blame. *See Fleming v. County of Kane*, 855 F.2d 496, 497 (7th Cir.1988) (per curiam) (quoting *United States v. Keplinger*, 776 F.2d 678, 683 (7th Cir.1985), *cert. denied*, 476 U.S. 1183, 106 S.Ct. 2919, 91 L.Ed.2d 548 (1986)) ("Overly long briefs, however, may actually hurt a party's case, making it 'far more likely that meritorious arguments will be lost amid the mass of detail.' ").

473, 476–77 (7th Cir.), *cert. denied*, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988). Additionally, facts must be supported by evidence that would be admissible if presented at trial. Fed.R.Civ.P. 56(e); *Randle v. LaSalle Telecommunications, Inc.*, 876 F.2d 563, 570 n. 4 (7th Cir.1989). Any documents submitted must be properly authenticated. *See Zayre Corp. v. S.M. & R. Co.*, 882 F.2d 1145, 1149–50 (7th Cir.1989).

The following facts are uncontested. *See* Final Pretrial Order Attachment A.[3] Turner resides at 2450 West Monroe Street, Apartment 108 in Chicago. This apartment is in a CHA development known as Rockwell Gardens. Turner has four children, including David, who was born in 1966. Turner has lived at 2450 West Monroe since 1974, but lived in Apartment 207 until June 1982. She entered into a lease agreement with CHA in 1976. As of 1983, Turner listed all four of her children as authorized occupants of her apartment. From sometime in 1983 until May 15, 1988, David was incarcerated. From 1984 through 1989, David was not included among the "authorized occupants" listed on Turner's applications. David is acquainted with people who reside in Rockwell Gardens, including friends and relatives. On May 20, 1989, David was arrested by the Chicago Police while on CHA property at Rockwell Gardens. He was arrested outside the building located at 117 South Rockwell, not at the building containing his mother's apartment.[4] On the arrest report for this incident, Turner's address is listed as both 2450 West Monroe and 139 North Lorel. The arrest report sparked a review by CHA as to who was authorized to live in Turner's apartment. On June 27, 1990, CHA served Turner with a Notice of Termination of Tenancy. On July 31, 1990, a state court eviction action against Turner was dismissed without prejudice.

Donner resides at 220 East 63rd Street, Apartment 1403 in Chicago. This apartment is in a CHA development known as Washington Park Homes. Donner has four children, including Carl, who was born in 1964. Donner has lived in the same apartment since 1972. Her current lease was signed in 1976. From 1972 until sometime in 1983, Carl was listed on Donner's applications for continued occupancy as an authorized occupant. Since then, he has not been listed as an authorized occupant. Carl is acquainted with a number of people, other than his mother, who live in Washington Park Homes. On December 10, 1988, Carl was arrested by Chicago Police in the parking lot at 220 East 63rd Street. The arrest was for unlawful possession of a controlled substance. The arrest report for this incident lists Donner's apartment as Carl's address. Donner was subsequently called into an interview with Washington Park staff where she stated Carl did not reside with her. She was told eviction proceedings would begin if she could not provide evidence that Carl lived elsewhere. On April 4, 1989, she provided a photocopy of an Illinois identification card issued the previous day that showed Carl's address as 6127 South Indiana Avenue in Chicago. On June 8, 1989, CHA served Donner with a Notice of Termination of Tenancy. On July 31, 1990, a state court eviction action against Donner was dismissed without prejudice.

Although not contained in the pretrial order's agreed statement of uncontested facts, there are also other facts over which the parties have no disagreement. There is no disagreement as to the language of the

---

**3.** Although defendants attempt to deny some of these facts in responding to plaintiffs' Local Rule 12(m) statement of material facts, defendants cannot deny facts that they have agreed are uncontested.

**4.** Judicial notice is taken of the fact that 117 South Rockwell is approximately one and one-half city blocks from 2450 West Monroe. In Chicago, a city block is approximately one-eighth of a mile. Defendants contend the ad-

dresses are for two buildings adjacent to each other, but the portions of the record that they cite do not support this contention. They cite to a map of CHA developments, but no legible portion of the copies provided shows these two addresses are adjacent. On the page of Turner's deposition testimony that defendants cite, she testified 117 South Rockwell is three buildings from the one she resides in and that one of David's nephews lives in that building.

leases applicable to each plaintiff. The leases include the following language in ¶ 9(k): "The Tenant shall ... (k) conduct himself and cause other persons who are on the premises with his consent to conduct themselves in a manner which will not disturb his neighbor's peaceful enjoyment of their accommodations and will be conducive to maintaining the development in a decent, safe and sanitary condition." On May 23, 1990, David was arrested for possession of a weapon and a controlled substance.[5] He had previously pleaded guilty to possessing a controlled substance with intent to deliver. Turner's notice of termination states she created a threat to the health and safety of others in that David, an "unauthorized occupant and/or guest in" Turner's apartment, possessed PCP and a .32 caliber revolver on May 20, 1989 while on CHA property at 117 South Rockwell. Donner's notice of termination states she created and or maintained a threat to the health and safety of others in that Carl, "authorize [sic] quest [sic] of leaseholder, Mozella Donner, did have in his possession at 220 E. 63rd Street, C.H.A. property a controlled substance. (cocaine)[.]"

Defendants contend that there is evidence that David and Carl each resided in his respective mother's apartment as of the time of his arrest. While there is sufficient evidence to raise a factual dispute as to David, there is no evidence to raise a fact dispute as to whether Carl was residing with his mother at the time of his arrest. Defendants primarily rely upon police reports which give an address for each of the sons that are the same as the mother's address. It is doubtful that the police reports could be used as evidence of where David or Carl resided.[6] There is no supporting affidavit from any of the arresting officers to show that David or Carl actually said they resided at the addresses listed on the reports. At their depositions, both sons denied telling the arresting officers that they resided at those addresses at the time of their arrests. Carl testified that he only told the police that his mother lived at the address that was put on the report. Carl and David each testified that he lived at an address other than his mother's apartment. Each mother also testified that her son did not reside with her. There are also a number of other witnesses who testified either that the son did not reside with the mother or that the son lived at another address. Defendants do not present testimony nor an affidavit from any person stating that either of the sons lived with his mother. With respect to David Turner, however, plaintiffs admit he visited his mother's apartment frequently; that phone calls for him were received daily;[7] that he occasionally slept at his mother's apartment; that he received some mail there; and that friends visited him there. Turner also admitted at her deposition that David occasionally told people that her address was his own.[8] On the evidence presented, there is a material issue of fact as to whether David Turner lived with his mother at the time of his arrest. As for Carl Donner, there is no evidence to show he

**5.** In plaintiffs' Local Rule 12(m) statement, it is stated that David was arrested both for possessing a weapon and for possessing a controlled substance. The police report cited to support that fact, however, refers only to possession of a controlled substance. (Plaintiffs also cite Turner's Deposition at 63–64, but no support is found on those pages.) In their Rule 12(m) statement, defendants also contend David was arrested for possessing a weapon. Surprisingly, plaintiffs seek to dispute this same fact which they had already contended was undisputed. For purposes of the present motions, it will be assumed David was arrested for both possessing a gun and possessing controlled substances.

**6.** Defendants make no attempt to explain the basis for admitting the police reports as evidence of where David and Carl resided. Plaintiffs object that the reports would be hearsay if used for that purpose. Although this objection is presented for the first time in plaintiffs' reply (which is the proper place for it to appear given the fact that defendants first had to use the reports before plaintiffs had any reason for objecting), the objection should have come as no surprise to defendants. In the pretrial order, plaintiffs indicated they objected to the reports as unauthenticated and inadmissible hearsay. *See* Final Pretrial Order Attachment D.

**7.** It is also stated that he did not have a telephone at his own residence.

**8.** The implication is that he would give this address so he would not be challenged for being at Rockwell Gardens.

resided with his mother nor even that he frequently visited her. On the facts presented to this court, the trier of fact could only find that, at the time of his arrest, Carl resided elsewhere than at his mother's apartment.

Although the evidence is inconclusive as to where David resided, plaintiffs do concede at least the following regarding David. From the time he was released from prison in 1988 until August 1989, David visited his mother three to four times a week. In August 1989, he began visiting for about a half hour every day because Turner was babysitting for David's daughter. He also stayed overnight at Turner's apartment approximately twice a month. David was at Turner's apartment the day he was arrested, but there is no evidence presented to show that he was there shortly before being arrested. Turner testified David was at her apartment earlier in the day on the date David was arrested, but not shortly before he was arrested. David testified that, at the time of his arrest, he had been visiting his nephew, who resides at 117 South Rockwell. However, to the extent there is a factual dispute as to his actual residence, there is sufficient evidence to also create a factual dispute as to whether David was at his mother's apartment before being arrested.

As for Carl, it is conceded that he visited his mother on occasion, but there is no evidence as to how frequently that may have been. Donner testified that Carl did not visit her on the date he was arrested and that he had not visited her since Thanksgiving, approximately two weeks earlier. Defendants, however, point to the circumstantial evidence that Carl was arrested in the parking lot of the building where his mother lives. Although, Carl knows other people who reside in the building, the trier of fact could conclude Carl visited his mother on the day he was arrested.

On motions for summary judgment, factual disputes are resolved in favor of nonmovants. For purposes of plaintiffs' motions for summary judgment, it must be assumed David resided with his mother and that he was there shortly before his arrest. It would also be assumed that Carl did not reside with his mother, but that he visited her shortly before his arrest. For purposes of defendants' motion for summary judgment, though, the disputed facts are otherwise resolved. On defendants' motion, it is assumed David did not reside with his mother and that he visited his nephew, not his mother, prior to being arrested. It is also assumed that Carl did not live with his mother and that he had not visited her for two weeks prior to his arrest.

The parties disagree as to what CHA's general policies are as to termination of leases based on the conduct of persons who are not occupants of the leaseholder's unit. Plaintiffs contend that defendants have the following policies:

CHA has a policy pursuant to which a CHA leaseholder is responsible for his or her guests and visitors as long as they are on CHA property, even if the guest leaves the CHA property and later comes back to the property without the tenant's knowledge.

CHA has a policy pursuant to which a CHA leaseholder can be evicted for the actions of a third-party even if those actions take place outside the leaseholder's apartment.

CHA gives broad discretion to project managers and their staff to interpret and apply CHA's termination policies and to make termination decisions.

Plaintiffs cite Lane's deposition to support these facts. While Lane's testimony supports the first two paragraphs, the cited testimony does not support the contention that project managers and their staff have *broad* discretion in interpreting and applying the policies. With the exception of how broad the staff's discretion may be, defendants do not dispute the above contentions. Defendants seek to clarify and add to plaintiffs' brief summary, but do not contradict anything plaintiffs' contend other than the degree of discretion. Thus defendants contend some of the policies are pursuant to federal requirements and that whether a tenant's lease is terminated depends on the

particular circumstances of the lease, neither of which are inconsistent with plaintiffs' contention. The quoted summary of defendants' policies will be taken as true except as to the degree of discretion.

There is no disputed fact issue as to defendants having a policy of terminating leases based on conduct of guests. In their Rule 12(m) and 12(n) statements, plaintiffs do not expressly contend that there is evidence that defendants terminate leases based on the conduct of a third party solely because that person is a relative of the leaseholder. However, they provide a number of notices of termination in which reference is made to the guest or other occupant being a relative. In a few instances, the third party is only referred to as being a relative without also being referred to as being a guest or occupant. On some of the other notices, the third party is referred to as being a relative *or* guest. Also, as plaintiffs argue in their briefs, it can be inferred that Donner and Turner were held responsible for the acts of their sons only because David and Carl were their sons. As the case now stands, it is a disputed factual issue as to whether defendants have a policy of holding tenants responsible for acts of relatives that is different from the policy applied to other nonoccupants or guests.

The parties also disagree as to the type of administrative hearing procedures they provide prior to termination of a lease, both as a general matter and as to the two named plaintiffs. There are apparently factual disputes that prevent determining whether the administrative hearings provided are adequate procedures. As explained below, however, that is a nonmaterial factual dispute since available court proceedings are adequate.

In light of the above-described facts, the merits of plaintiffs' claims can now be addressed.[9] Plaintiffs divide their First Amended Complaint into eight counts,[10] one of which (Count 7) they expressly concede should be dismissed. The first four counts are on behalf of the class and Counts 5 through 8 are on behalf of the named plaintiffs. Counts 1 and 5 are characterized as due process claims based on (a) punishing a person for the conduct of another over whom she has no control and (b) ¶ 9(k) of plaintiffs' lease being vague and overbroad. Counts 2 and 6 are characterized as First Amendment claims based on interference with plaintiffs' rights to associate with family members. Count 3 is characterized as a claim under the Housing Act for having lease provisions inconsistent with that Act. Counts 4 and 8 are characterized as claims for violations of the leases. Counts 4 and 8 are apparently pendent state law contract claims.[11]

The contract claims will be addressed first. Paragraph 14(a) of plaintiffs' leases provides that "Management shall not terminate or refuse to renew the lease for other than serious or repeated violation of material terms of the lease such as failure to make payments due under the lease or to fulfill Tenant obligations set forth in paragraph 9 or for other good cause."[12]

---

9. All of plaintiffs' arguments are based on the assumption that the nonleaseholder, whose conduct is the basis of termination, is also not residing in the leaseholder's unit. Since there is a disputed issue as to whether David resided with Turner, Turner cannot be entitled to summary judgment on the arguments presented. It still must be considered whether defendants are entitled to summary judgment on Turner's individual claims, but only with the assumption being applied that David did not reside with his mother nor visit her prior to his arrest.

10. Plaintiffs label them as First Cause of Action, Second Cause of Action, etc. For convenience, they will be referred to as Count 1, Count 2, etc.

11. Since the parties do not discuss the issue, it is assumed that the law of the state in which this

court sits applies to the state law claims. *Shore v. Dandurand,* 875 F.2d 656, 659 (7th Cir.1989).

12. Paragraph 9 is as follows:

9. The Tenant shall (a) not assign the lease or sublease the premises; (b) not provide accommodations for boarders or lodgers; (c) use the premises solely as a private dwelling unit for the Tenant, and the Tenant's household as identified in the lease, and not use or permit its use for any other purpose; (d) abide by necessary and reasonable regulations promulgated by Management for the benefit and well-being of the housing project and the tenants which shall be posted in the Project Management Office and incorporated by reference in this lease; (e) comply with all obligations primarily imposed upon tenants by

Defendants do not contend that any provision other than ¶ 9(k) provides a basis for terminating leases on the ground of misconduct of a nonresident occurring outside the leaseholder's unit. Paragraph 9(k) refers to conduct of "persons who are on the premises with [the tenant's] consent." Defendants contend "premises" means not just the leaseholder's dwelling unit, but also the grounds and common areas of the leaseholder's development. Plaintiffs contend "premises" means only the leaseholder's dwelling unit.

The words "premises," "dwelling," "unit," and "dwelling unit" appear numerous times in the parties' leases. Presumably, defendants would not dispute that "dwelling unit" means anything beyond the leaseholder's individual apartment. Nevertheless, "premises" and "dwelling unit" are used interchangeably without any apparent pattern in the use of one or the other. More on point, there is not a single use of the term "premises" where it clearly means more than just the individual dwelling unit, whereas "premises" is repeatedly used in instances where it clearly means only the individual dwelling unit. The use of "premises" where it clearly means only the dwelling unit are as follows:

(1) Paragraph 7 refers to "exclusive use and occupancy of the leased *premises*." Since the tenant does not have exclusive use of common areas, this use of premises can only mean the individual dwelling unit.

(2) Paragraph 8(a) provides that Management is to "maintain the *premises* and the development." If premises includes common areas of the entire project, there would be no reason to add "and the development."

(3) Paragraph 8(f) provides that Management shall provide receptacles for garbage and waste "removed from the *premises* by the tenant." This clearly refers to removal of garbage from the individual dwelling unit.

(4) Paragraph 9(c) provides the Tenant shall "use the *premises* solely as a private dwelling unit." The common areas would not be used as a private dwelling unit.

(5) Paragraph 9(f) refers to "the *premises* and such other areas as may be assigned to [the tenant] for his exclusive uses." Common areas are not assigned for exclusive use.

(6) Paragraph 9(g) refers to the Tenant being responsible for disposal of garbage and rubbish from "the *premises*." The tenant would only be responsible for garbage from her own unit.

(7) Paragraph 9(i) refers to "the *premises* or development," again contrasting premises with the entire development. Similarly, ¶ 9(j) refers to "the *premises*, projects, buildings, facilities or common areas."

(8) Paragraph 12 is entitled "Entry of *Premises*." It clearly refers to entry into the individual dwelling unit. In subsection (a), it refers to entering "the dwelling unit" and, in subsection (b), it refers to entering "the *premises*." Subsection (c) refers to all members of the household being "absent from the *prem-*

---

applicable provisions of building and housing codes materially affecting health and safety; (f) keep the premises and such other areas as may be assigned to him for his exclusive uses in a clear and safe condition; (g) dispose of all ashes, garbage, rubbish, and other waste from the premises in a sanitary and safe manner; (h) use in a reasonable manner all electrical, plumbing, sanitary, heating, ventilating, air-conditioning and other appurtenances including elevators; (i) refrain from and cause his household members and guests to refrain from destroying, defacing, damaging or removing any part of the premises or development; (j) pay reasonable charges (other than for normal wear and tear) for the repair of damages to the premises, project buildings,

facilities or common areas caused by the Tenant, his household members or guests; and (k) conduct himself and cause other persons who are on the premises with his consent to conduct themselves in a manner which will not disturb his neighbors' peaceful enjoyment of their accommodations and will be conducive to maintaining the development in a decent, safe and sanitary condition; (*l*) refrain from illegal or other activity which impairs the physical or social environment of the development; (m) perform seasonal maintenance or other maintenance tasks in single family, duplex and row houses in accordance with the rules established in the Tenants Handbook.

*ises* at the time of entry" and Management leaving notice for the tenant "on the *premises* ... prior to leaving the *premises.*" Clearly, each such use of "premises" in this paragraph refers to the individual dwelling unit.

(9) Paragraph 17 requires the Tenant to pay all costs and expenses of "recovering possession of the said *premises.*" Since there is no prior use of "premises" in that paragraph nor even in the previous paragraph, *"said* premises" must mean premises as used throughout the lease. Since CHA always had control of the common areas, recovery of said premises can only mean recovery of the individual dwelling unit.

■ As used in the parties' leases, the word "premises" means the leaseholder's individual dwelling unit. Because the word is not ambiguous, there is no need to resort to extrinsic evidence in construing the contract. *LaSalle National Bank v. Service Merchandise Co.,* 827 F.2d 74, 78 (7th Cir. 1987).[13] Paragraph 9(k) cannot be a basis for terminating a lease based on a nonoccupant's conduct that takes place away from the dwelling unit, even if the conduct occurs on CHA property.[14]

■ Donner's lease should not have been terminated pursuant to ¶ 9(k) based on Carl's conduct in the parking lot. Donner is entitled to an injunction prohibiting CHA from terminating her lease based on the June 8, 1989 notice of termination.[15] While plaintiffs only ask for summary

judgment on liability, there is no indication that Donner would also be entitled to any damages on her contract claim since she was never evicted nor charged any additional rent or penalty. On Donner's Count 8 claim, there is no need for any further hearing on damages. As already indicated, Turner's situation is different. A factual dispute exists as to whether David was residing with Turner. Summary judgment cannot be granted for either side on Turner's Count 8 claim.

■ As for the class, there is no dispute that CHA has a policy of terminating leases based on the conduct of guests of leaseholders, even if the conduct occurs outside the leaseholder's unit and the guest is not residing with the leaseholder. Regardless of the precise contours of the application of that policy, it would not be proper to base such a termination on ¶ 9(k) of the lease. Plaintiffs present a number of termination notices of class members, the authenticity of which defendants do not challenge, many of which rely in part on ¶ 9(k) as a basis for terminating the lease based on the conduct of a possible guest or nonleaseholder. Plaintiffs have presented sufficient undisputed evidence to justify granting classwide relief on Count 4. The declaratory or injunctive relief granted on Count 4, however, will be limited to terminations pursuant to ¶ 9(k) of the currently existing form lease. It will prohibit basing such a termination on conduct of a person who is not an occupant of the leaseholder's

13. Even if the term "premises" were ambiguous as used in ¶ 9(k), there would not be a need for a trial on the issue as defendants contend. Defendants do not point to any additional evidence relevant to the meaning of the term, let alone any disputed fact issues relevant to that determination. The extrinsic materials pointed to are state and federal statutes that can be given judicial notice and are not subject to dispute. Since there are no disputed facts, this court could decide the meaning of the term even if it were ambiguous, especially since this case is to be a bench trial, not a jury trial. *Cf. Air Line Stewards & Stewardesses Association v. American Airlines, Inc.,* 763 F.2d 875, 879 (7th Cir.1985), *cert. denied,* 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986). Even if the extrinsic material that defendants rely upon were to be considered along with the language of the contract,

this court would still conclude that premises means the individual dwelling unit.

14. Since not raised by any of the facts presented to this court, no determination is made as to whether conduct that occurs within the immediate vicinity of the dwelling unit could properly be a basis for invoking ¶ 9(k).

15. Although that notice also cites paragraphs 9(c) (premises to be used solely as a private dwelling unit for tenant and identified household members), 9(d) (abide by necessary and reasonable regulations promulgated by Management), and 9(*l*) (refrain from illegal or other activity which impairs the physical or social environment), defendants make no argument that any of those provisions apply to the present situation.

**1308**

apartment when the complained of conduct occurs off the premises of the leaseholder's dwelling unit. To achieve their broader goal of preventing *any* termination based on conduct of a nonoccupant occurring outside the leaseholder's dwelling unit, regardless of any reliance on ¶ 9(k) of the lease, plaintiffs must succeed on one of their other claims.

 Counts 1 and 5 have multiple aspects to them. The vagueness and overbreadth aspects will be addressed first. Defendants contend that neither of those constitutional doctrines can apply to a government contract, but instead are limited to being applied to statutes and regulations. Defendants cite no case that reaches such a conclusion, but do cite a case that suggests such a conclusion in *dictum. See Victor v. Brickley,* 476 F.Supp. 888, 894 n. 3 (E.D.Mich.1979). Plaintiffs cite no case in which vagueness or overbreadth was applied to a government contract, but argue that no good reason is given for distinguishing enforcement of a lease from enforcement of a criminal misdemeanor statute. They contend that losing a lease under ¶ 9(k) is a penal provision essentially indistinguishable from a criminal forfeiture provision. Plaintiffs cite to a criminal forfeiture case involving forfeiture of a federally subsidized lease and subsidy payments in which the court holds that loss of that property for the controlled substance crime committed would be an excessive penalty violative of Eighth Amendment prohibitions on excessive punishment. *See United States v. Robinson,* 721 F.Supp. 1541, 1543–44 (D.R.I.1989). In so holding, the court emphasized the devastating impact that loss of subsidized housing would have on an evicted tenant. *See id.* at 1544. Plaintiffs also point out that the particular lease provision in question is mandated by federal regulation, *see* 24 C.F.R. § 966.4(f)(11), possibly raising the question of whether the regulation itself is vague.[16] In any event, since the lease provision is neither unconstitutionally vague nor uncon-

stitutionally overbroad, it will be assumed, without deciding, that those doctrines apply to the lease provision. However, the vagueness doctrine does not apply equally to all circumstances. It applies less strictly to enactments concerned with economic regulation and those involving only civil penalties. *Keeffe v. Library of Congress,* 588 F.Supp. 778, 789 (D.D.C.1984), *aff'd in part, rev'd in part,* 777 F.2d 1573 (D.C.Cir. 1985). Thus, to the extent the doctrine should be applied to a government contract, it applies less strictly. On the other hand, it applies more strictly to the extent it impinges on constitutionally protected rights such as First Amendment rights. *Id.*

 Plaintiffs contend ¶ 9(k) is vague because it is unclear as to what persons the leaseholder can be responsible for and because it is also unclear as to where the conduct can occur. This court, however, has now construed the provision, with regard to nonoccupants, as being limited to persons who are in the leaseholder's dwelling unit with the leaseholder's consent. Plaintiffs also contend that the phrases "in a manner which will not disturb his neighbors' peaceful enjoyment" and "maintaining the development in a decent, ... condition" are vague. Such phrases, however, are sufficiently clear for a lease and can be understood by a tenant. Contrary to plaintiffs' assertion, a tenant would not reasonably believe that such provisions include prohibitions on criticism of CHA. There is no vagueness problem. There is also no overbreadth problem. The lease provision does not reach "a substantial amount of constitutionally protected conduct." It does not generally prohibit visits from relatives or others, it only prohibits visitors from engaging in certain nonprotected conduct while on the leaseholder's premises. The vagueness and overbreadth aspects of Counts 1 and 5 will be dismissed.

Counts 1 and 5 also contain a claim that defendants violate due process when they

---

**16.** Viewed narrowly, the regulation is not vague since it only requires that particular language be included in the lease, which is a clear provision. But to the extent enforcement of the lease

provision can be considered enforcement of the regulation, the clarity of the regulation comes into question.

terminate a lease based on the conduct of another over whom the leaseholder has no control. Although defendant moves for summary judgment on Count 1, plaintiffs do not. Named plaintiffs move for summary judgment on Count 5, but as previously noted, there is a factual dispute that prevents granting summary judgment in favor of Turner. Therefore, it need only be considered whether defendants are entitled to summary judgment on Counts 1 and 5 and whether Donner is entitled to summary judgment on Count 5.[17]

■■■■ The parties agree that, to succeed on their substantive due process claims, plaintiffs must show that defendants' actions (1) deprived plaintiffs of their property (2) for an irrational or invidious purpose. *Long Grove Country Club Estates, Inc. v. Village of Long Grove,* 693 F.Supp. 640, 657 (N.D.Ill.1988). The parties further agree that there is a third element. Plaintiff must also show either that there is a violation of some other substantive constitutional right or that state law remedies are inadequate. *Polenz v. Parrott,* 883 F.2d 551, 557–58 (7th Cir. 1989); *New Burnham Prairie Homes v. Village of Burnham,* 910 F.2d 1474, 1481 (7th Cir.1990). The parties agree that plaintiffs have a protectable property interest in continued tenancy in public housing. *Joy v. Daniels,* 479 F.2d 1236, 1239–42 (4th Cir.1973). Furthermore, the parties agree that it would be an irrational deprivation of property to evict one of the plaintiffs based on the conduct of a third party when there is no causal nexus between that plaintiff and the third party. *Tyson v. New York City Housing Authority,* 369 F.Supp. 513, 518–19 (S.D.N.Y.1974). They do disagree as to what constitutes a causal nexus, with both sides implicitly agreeing that being an occupant of the leaseholder's unit would be a sufficient causal nexus, but disagreeing as to whether the conduct of a guest can be attributed to the leaseholder. They do agree that being a relative is, by itself, an insufficient nexus. *See id.* Furthermore, plaintiffs contend both that the right to

association is interfered with and that state remedies are inadequate, with defendants disagreeing with both of those contentions. In light of the factual disputes as to David's and Carl's visiting status and the full contours of CHA's general policies as to lease terminations based on the conduct of guests, resolution of legal issues as to the required causal nexus will await the trial.

■■■■ As regards the third element, there is a factual dispute as to whether defendants interfered with plaintiffs' associational rights by treating the conduct of nonresident family members differently. There is also a factual dispute as to whether the state administrative procedures provided were adequate. Plaintiffs also argue, though, that regardless of the adequacy of the administrative procedures, this can be no basis for denying their claims because of available state remedies since the procedures defendants refer to do not provide for monetary damages. First, it is noted that state law remedies can be found to be adequate even if they do not provide the full extent of remedies that § 1983 provides. *See Easter House v. Felder,* 910 F.2d 1387, 1406 (7th Cir.1990) (en banc), *cert. denied,* —— U.S. ——, 111 S.Ct. 783, 112 L.Ed.2d 846 (1991). In any event, the question of damages should not arise unless the state only provides postdeprivation remedies. The procedures that defendants point to in this case are predeprivation remedies. Thus, if a plaintiff were to succeed pursuant to the available procedures, she would not be evicted and thus would not have property deprived for an invidious or irrational reason. Therefore, if the predeprivation procedures are adequate, plaintiff would have no claim unless there is a violation of a substantive constitutional right.

■■■■ As defendants correctly contend, they cannot evict any tenant who opposes eviction without bringing a state court forcible entry and detainer action. *See* Ill.Rev. Stat. ch. 110, ¶¶ 9–101 *et seq.* Such an

---

**17.** Contrary to defendants' argument, no claim will be dismissed because plaintiffs failed to expressly label any claim as one pursuant to 42 U.S.C. § 1983 or because some claims may have been mislabeled as First Amendment instead of Fourteenth Amendment claims.

action provides adequate due process. *See Johnson v. Illinois Department of Public Aid,* 467 F.2d 1269, 1273–74 (7th Cir.1972); *Matthews v. Round Barn Manor Association,* No. 85 C 10702, 1986 WL 8738 (N.D. Ill. Aug. 4, 1986). Moreover, constitutional defenses can be raised in such proceedings. *Matthews, supra. See also Peoria Housing Authority v. Sanders,* 54 Ill.2d 478, 298 N.E.2d 173 (1973). Thus, plaintiffs could prevent any eviction based on an inadequate causal nexus from ever occurring by raising the defense that eviction on such a basis is constitutionally prohibited. Since there is a constitutionally adequate predeprivation procedure available, plaintiffs can only satisfy the third element of their substantive due process claim if they can show their right to association was infringed. Since there are disputed facts as to that issue as well as the causal nexus element, summary judgment cannot be granted for either party on the substantive due process claims contained in Counts 1 and 5.

Counts 2 and 6 are the claims based on interference with the right to associate with one's family. As previously indicated, there are factual disputes that prevent granting summary judgment for either side on these counts.

Counts 3 and 7 are based on alleged violations of the Housing Act. In named plaintiffs' motion for summary judgment, it is expressly conceded that Count 7 should be dismissed. No express concession is contained in the class plaintiffs' motion, but plaintiffs provided no response to defendants' argument that Count 3 should be dismissed. Therefore, Counts 3 and 7 will be dismissed.

For the foregoing reasons, Donner and the class are entitled to declaratory and injunctive relief on, respectively, Counts 8 and 4 of the complaint. Turner's Count 8 claim, the "causal nexus" claims in Counts 1 and 5, and Counts 2 and 6 remain to be tried.

IT IS THEREFORE ORDERED that:

(1) Plaintiffs' motions for summary judgment are granted in part and denied in part. Plaintiffs will be granted declaratory and injunctive relief on the class's Fourth Cause of Action and Donner's Eighth Cause of Action.

(2) Defendants' motion for summary judgment is granted in part and denied in part. The Third and Seventh Causes of Action are dismissed. The vagueness and overbreadth aspects of the First and Fifth Causes of Action are also dismissed.

(3) The parties are ordered to submit amended proposed findings of fact and conclusions of law consistent with this opinion at a status conference to be held on March 19, 1991 at 9:15 a.m.